2003 SD 107

**CONSOLIDATED NUTRITION, L.C., Plaintiff and Appellant,**

v.

**IBP, INC., a Delaware Corporation, Defendant and Appellee.**

No. 22456.

Supreme Court of South Dakota.

Considered on Briefs Nov. 19, 2002.

Reassigned June 4, 2003.

Decided Aug. 27, 2003.

Robert W. Klimisch of Goetz & Klimisch, Yankton, South Dakota, Attorneys for plaintiff and appellant.

Roger W. Damgaard of Woods, Fuller, Shultz & Smith, Sioux Falls, South Dakota, Attorneys for defendant and appellee.

ZINTER, Justice (on reassignment).

[¶ 1.] IBP, Inc. (IBP), entered into a hog procurement contract with livestock producers, David and Kim Bloch (Blochs). Blochs also gave Tri County Ag Service a security interest in their hogs. This security interest was later assigned to Consolidated Nutrition, L.C. (Consolidated). IBP subsequently purchased hogs from the Blochs under the contract, but without notice of Consolidated's security interest. After the sale, IBP applied part of the proceeds to satisfy Blochs' preexisting debt under a "deficiency account" that was created by the procurement contract. Consolidated then commenced this action to recover the hog sale proceeds from IBP. The circuit court held that under the federal Food Security Act (FSA),[1] IBP took the hogs and the proceeds free of Consolidated's security interest. Consolidated appeals. We agree that under the FSA, IBP took the hogs free of Consolidated's security interest. However, we hold that this priority dispute over proceeds is governed by the Uniform Commercial Code rather than the FSA. We also hold that under the UCC, Consolidated's security interest was subject to IBP's contractual right of setoff.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] IBP purchased hogs from farm producers for IBP's hog processing plants. IBP had hog procurement contracts with approximately 130 hog producers/farmers. IBP was also registered as a buyer of farm products with the South Dakota Secretary of State's Office pursuant to the FSA.

---

1. *See* Food Security Act of 1985, 7 USC § 1631.

[¶ 3.] The Blochs were engaged in a farming and hog production operation. On May 22, 1998, the Blochs entered into the hog procurement contract with IBP. Consolidated, a feed supply company, subsequently extended credit to, and took a security interest from the Blochs for feed supplies.

[¶ 4.] The hog procurement contract created a price stabilization mechanism for hog producers. Under the contract, IBP agreed to pay a "floor price" calculated by a formula. Under the formula, if the market price was higher than the floor price, IBP kept a portion of the excess and applied it to a "reserve account." The remaining portion was paid to the seller. If the market price was lower than the floor price, IBP agreed to pay the floor price by supplementing the market price with proceeds from the reserve account. If the reserve account had a zero balance, IBP still paid the floor price, but it then created a "deficiency account" to cover the difference. If subsequent sale prices exceeded the floor price, the excess was applied to satisfy the deficiency account. When the agreement terminated, the seller remained liable for any balance in the deficiency account.[2]

[¶ 5.] In 2001, the Blochs sold hogs to IBP under the contract. On April 6, Blochs sold 590 hogs to IBP for over $70,000. Because Blochs had a deficiency account at that time, IBP applied approximately $62,000 of the proceeds to Blochs' deficiency account. On April 13, Blochs sold 321 hogs to IBP for over $30,000. Blochs received the entire proceeds of that sale.

[¶ 6.] Prior to the April 2001 hog sales, IBP was not on notice from Tri County Ag Service, Consolidated, the Blochs, or by a filed financing statement,[3] that Consolidated had a security interest in the hogs. Tri County Ag Service did not file its "Nutrition Feeder Credit Application" with the Secretary of State's office until May 7, 2001. Furthermore, Tri County Ag Ser-

2. The Hog Procurement Agreement provided:
Section 4(c):
When the Market Price (converted from a carcass to a live price) is less than the Floor Price, as defined in Schedule 4(c), the Floor Price shall be paid to Producer. When the Market Price is less than the Floor Price, the difference between the Market Price and the Floor Price, multiplied by the total live weight (expressed in cwt) of that lot, the "Deficiency Amount", [sic] shall be drawn from the Reserve Account (defined below) if the Reserve Account has a positive balance. When the Reserve Account balance has been reduced to zero, then the Deficiency Amount shall be accrued in the Deficiency Account (defined below) pursuant to Section 5.
Section 5(b):
When there are Deficiency Amounts, and when the Reserve Account has a zero balance, such Deficiency Amounts will be accounted for by IBP in an account maintained by IBP for Producer to accrue Deficiency Amounts ("Deficiency Account") . . . .

Section 6:
If the Deficiency Account has a positive balance, deductions will be made from Producer checks for Market Hogs when the Market Price (converted to a live price) exceeds the Floor Price. All amounts which exceed the Floor Price shall be subtracted from Producer's check and applied to the Deficiency Account balance until the Deficiency Account is reduced to zero. If there is no Deficiency Account balance, then the Market Price will be paid to Producer subject to Reserve Amount deductions pursuant to Section 5.

3. As explained hereafter, Consolidated's failure to timely perfect its security interest by filing a financing statement is not relevant to our analysis under the FSA or SDCL 57A–9–318 (1997) because under either law, even a perfected security interest is subordinated. Therefore, to simplify this opinion we omit further reference to the unperfected status of Consolidated's security interest.

vice did not file a Form UCC–3, noting an assignment of its security interest to Consolidated, until May 21, 2001. Finally, Consolidated did not send a written notice to IBP informing it of Consolidated's security interest until July 9, 2001, and Consolidated failed to file an "effective financing statement" under the FSA.

[¶ 7.] Nevertheless, Consolidated initiated this action to recover the proceeds of the hog sales from IBP. IBP filed an answer and a motion for summary judgment. Following a hearing, the court granted summary judgment in favor of IBP. The trial court concluded that, under the FSA, IBP took the hogs (farm products [4]) and the proceeds free of Consolidated's security interest because IBP was a "buyer in the ordinary course" and it had not received the notice required by the FSA. The court also granted the motion because Consolidated did not offer to file a criminal complaint against the Blochs as required by SDCL 57A–9–609.1. Consolidated appeals.

## DECISION

**Under the FSA, IBP took the hogs free of Consolidated's security interest, and under the UCC, Consolidated's security interest in the proceeds was subject to IBP's contractual right of setoff.**

[¶ 8.] The standard of review of summary judgments is well settled:

In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and [established] entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party[,] and reasonable doubts should be resolved against the moving party.... Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied.

*Braun v. New Hope Township,* 2002 SD 67, ¶ 8, 646 N.W.2d 737, 739 (citing *South Dakota State Cement Plant Comm'n v. Wausau Underwriters Ins. Co.,* 2000 SD 116, ¶ 9, 616 N.W.2d 397, 400–01).

[¶ 9.] The undisputed facts of this case reveal that neither Consolidated nor Tri County Ag Service gave timely notice to IBP of their security interest in the hogs. Consolidated did not file with the Secretary of State's office until nearly one month after the final hog transaction. Consolidated also failed to give the notice required to protect its security interest under the FSA. Therefore, because IBP was a "buyer in the ordinary course," it took the hogs and was entitled to pay Blochs free of Consolidated's security interest under the FSA.[5] *See Farmers and*

---

4. The Food Security Act defines "farm product" as follows:

The term "farm product" means an agricultural commodity such as wheat, corn, soybeans, or a species of livestock such as cattle, hogs, sheep, horses, or poultry used or produced in farming operations, or a product of such crop or livestock in its unmanufactured state (such as ginned cotton, wool-clip, maple syrup, milk, and eggs), that is in the possession of a person engaged in farming operations.

7 USC § 1631(c)(5).

5. The Food Security Act, 7 USC § 1631, provides in part:

(d) Purchases free of security interest

Except as provided in subsection (e) of this section and notwithstanding any other provision of Federal, State, or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected; and the buyer knows of the existence of such interest.

*Merchants State Bank v. Teveldal,* 524 N.W.2d 874, 878 (S.D.1994).

[¶ 10.] Although IBP *took* the *hogs* free of Consolidated's security interest under the FSA, we must next determine whether the FSA applies to the *priority dispute* over the *proceeds* applied to the Blochs' deficiency account with IBP. We begin the analysis by reiterating the distinction between claims to *the hogs* and claims to *the proceeds* of that collateral. That well recognized distinction was mentioned in *Teveldal. Id.* at 876 (noting that bank "brought suit [against a feed supplier] to determine the priority of the competing security interests in ... hogs *and* the *proceeds* from the sale to [a meat packer]") (emphasis added).

[¶ 11.] We must also consider the different priority analysis that applies to farm products and their proceeds. With respect to the taking of farm products:

> The FSA provides that "a buyer, who in the ordinary course of business buys a farm product from a seller engaged in farming operations *shall take free of a security interest* created by the seller, *even though the security interest is perfected* [,] and the buyer knows of the existence of such interest." [6]

*Teveldal,* 524 N.W.2d at 878 (quoting 7 USC § 1631(d)).

[¶ 12.] However, "[o]ther than eliminating double payment liability for a 'buyer in ordinary course' in farm prod-

(e) Purchases subject to security interest

A buyer of farm products takes subject to a security interest created by the seller if— (1)(A) within 1 year before the sale of the farm products, the buyer has received from the secured party or the seller written notice of the security interest organized according to farm products that—

(i) is an original or reproduced copy thereof;

(ii) contains,

(I) the name and address of the secured party;

(II) the name and address of the person indebted to the secured party;

(III) the social security number of the debtor or, in the case of a debtor doing business other than as an individual, the Internal Revenue Service taxpayer identification number of such debtor; and

(IV) a description of the farm products subject to the security interest created by the debtor, including the amount of such products where applicable, crop year, and the name of each county or parish in which the farm products are produced or located;

(iii) must be amended in writing, within 3 months, similarly signed, authorized, or otherwise authenticated and transmitted, to reflect material changes;

(iv) will lapse on either the expiration period of the statement or the transmission of a notice signed, authorized, or otherwise authenticated by the secured party that the statement has lapsed, whichever occurs first; and

(v) contains any payment obligations imposed on the buyer by the secured party as conditions for waiver or release of the security interest; and

(B) the buyer has failed to perform the payment obligations, or (2) in the case of a farm product produced in a State that has established a central filing system—

(A) the buyer has failed to register with the Secretary of State of such State prior to the purchase of farm products; and

(B) the secured party has filed an effective financing statement or notice that covers the farm products being sold; or

(3) in the case of a farm product produced in a State that has established a central filing system, the buyer—

(A) receives from the Secretary of State of such State written notice as provided in subsection (c)(2)(E) or (c)(2)(F) that specifies both the seller and the farm product being sold by such seller as being subject to an effective financing statement or notice; and

(B) does not secure a waiver or release of the security interest specified in such effective financing statement or notice from the secured party by performing any payment obligation or otherwise.

6. *See supra* note 5.

ucts, Congress did not intend to preempt state law relating to the creation, perfection, or priority of security interests." *Id.* at 878–79 (citing 9 CFR § 205.202; *Food Servs. of America v. Royal Heights,* 69 Wash.App. 784, 850 P.2d 585, 588 (1993)). Therefore, we have implicitly recognized that the application of proceeds to a preexisting contractual debt would not be protected by the priority rules of the FSA. We did so by denying "buyer in the ordinary course" status to such buyers.

"Buying" does not include receiving goods or document of title under a *preexisting contract* as security "for or in total or partial satisfaction of a *money debt,*" SDCL 57A–1–201(9), thereby excluding "attaching creditors and others who take goods in satisfaction of preexisting debts" from the definition of a "buyer in ordinary course."

*Teveldal,* 524 N.W.2d at 878 (citing 2 James White & Robert Summers, Uniform Commercial Code § 26–13, at 533 n. 2 (3rd ed. 1988)) (emphasis added).

■ [¶ 13.] Other courts explicitly hold that a buyer or commission merchant entitled to priority for a purchase under the FSA, who also extends credit and then seeks to retain *proceeds* from the sale as repayment, is not protected by the FSA. A party who "retain[s] ... the ... proceeds from the sale of the [farm products]" is acting as a lender instead of a party protected by the FSA. *Food Servs. of America v. Royal Heights, Inc.,* 123 Wash.2d 779, 871 P.2d 590, 593 (1994). Therefore, a party who seeks to retain the proceeds from the sale of farm products in repayment of an obligation as a lender, must look to state law to determine the priority of interests. *Id.* The rationale for this rule is that the FSA was designed to protect "buyers and commission merchants ... [but not] to reorder the normal priority of liens in farm products with regard to competing lenders." [7] *Id.* at 595.

[¶ 14.] Therefore, IBP was entitled to "buyer in the ordinary course" priority under the FSA to the extent that it purchased the hogs and paid Blochs. However, IBP was not entitled to that priority to the extent that it acted as a creditor and setoff the sale proceeds to satisfy Blochs preexisting debt under the hog procurement contract.

■ [¶ 15.] Having determined that IBP was not entitled to FSA protection to the extent that it applied the hog sale proceeds to Bloch's preexisting debt, we must now look to state law to determine the priority of IBP's and Consolidated's conflicting claims. IBP argues that it had a common law, contractual right of setoff that allowed it to keep the proceeds of the hog sale notwithstanding Consolidated's security interest. IBP argues that SDCL

---

7. The Congressional record clearly established that the FSA was not intended to preempt state laws on the creation, perfection, and *priority* of security interests between competing lenders.

[I]t is clear to us that the changes were not made to reorder the *normal priority* of liens in farm products *with regard to competing lenders.* The best evidence of Congress's intent is found in the House Committee Report on the Food Security Act of 1985 which states in relevant part:

The bill is intended to preempt state law (specifically the so-called "farm products exception" of the Uniform Commercial Code section 9–307) to the extent necessary to achieve the goals of this legislation. Thus, this Act would preempt state laws that set as conditions for buyer protection of the type provided by the bill requirements that the buyer check public records, obtain no-lien certificates from the farm products sellers, or otherwise seek out the lender and account to that lender for the sale proceeds. *By contrast, the bill would not preempt basic state-law rules on the creation, perfection, or priority of security interests.*

*Id.* at 595–96 (further citations omitted).

57A–9–104(9) (1986) took this case out of Article 9, and that its common law right of setoff was superior to Consolidated's security interest. However, we do not address IBP's common law argument because we conclude that even though IBP's claim is based on the right of setoff, this *priority dispute* is governed by Article 9.

[¶ 16.] Before beginning the analysis of the UCC's application to setoff, we note that Article 9 was substantially revised effective July 1, 2001. The transitional provision, SDCL 57A–9–709, provides that "if the relative priorities of the claims were established before July 1, 2001, former chapter 57A–9 determines priority." *Id.* Because these transactions occurred prior to July 1, 2001, we look to the pre-revision Article 9 to determine its applicability to this dispute.

[¶ 17.] IBP argues that pre-revision SDCL 57A–9–104(9) removed this case from the priority scheme of Article 9, and therefore, we should apply state common law. SDCL 57A–9–104(9) did generally provide that "[t]his chapter does not apply ... to any right of setoff...." IBP also cites two cases from other jurisdictions that held that UCC § 9–104(9) took setoffs entirely out of the scope of the UCC. *See State Bank of Rose Creek v. First Bank of Austin,* 320 N.W.2d 723, 725–26 (Minn. 1982); *Pennsylvania Nat'l Bank & Trust Co. v. CCNB Bank,* 446 Pa.Super. 625, 667 A.2d 1151, 1154 (1995). However, there were two major views on the scope of the setoff exclusion under § 9–104(9). *First Bank of Austin* analyzed the competing views.

Two views have been taken as to the meaning of section [9–104(9)]. The narrow view is that the section means simply that a right of set-off may exist in a creditor who does not comply with Article 9 security and filing requirements[, but the section does not exempt priority disputes involving setoff.] *Citizens Nat'l Bank v. Mid–States Dev. Co.,* [177 Ind.App. 548] 380 N.E.2d 1243 (Ind.App. 1978); *Associates Discount Corp. v. Fidelity Union Trust Co.,* 111 N.J.Super. 353, 268 A.2d 330 (1970).

. . .

Other courts and commentators have taken a broader view of the set-off exclusion, arguing that the provision takes all situations dealing with set-offs out of the ambit of Article 9, making the priority provisions inapplicable as well. *See, e.g., First Nat'l Bank v. Lone Star Life Ins. Co.,* 529 S.W.2d 67 (Tex.1975); Skilton, *The Secured Party's Rights in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Code,* 1977 S Ill ULJ 120, 201–06.

*First Bank of Austin,* 320 N.W.2d at 725.

[¶ 18.] We note that most jurisdictions have adopted the narrow view of the § 9–104(9) setoff exclusion. Under that narrow view, § 9–104(9) allowed a party to acquire a setoff right without abiding by the Article 9 requirements for *creating and perfecting* a security interest. The exclusion did not, however, take the setoff right out of the *priority scheme* of Article 9 when analyzing competing interests in the same collateral. We agree with this view.[8]

[¶ 19.] Our conclusion is reinforced by the 2001 revision of SDCL 57A–9–104(9).

---

**8.** *See Commerce Bank, N.A. v. Chrysler Realty Corp.,* 244 F.3d 777, 783 (10th Cir.2001); *In re Apex Oil Co.,* 975 F.2d 1365, 1367–68 (8thCir.1992); MNC *Commercial Corp. v. Joseph T. Ryerson & Son, Inc.,* 882 F.2d 615, 619 (2nd Cir.1989); *Pioneer Commercial Funding Corp. v. United Airlines, Inc.,* 122 B.R. 871, 881 (D.N.Y.1991); *Cont'l American Life Ins. Co. v. Griffin,* 251 Ga. 412, 306 S.E.2d 285, 286–87 (1983); *Citizens Nat'l Bank of Whitley County v. Mid–States Dev. Co., Inc.,* 177 Ind.App. 548, 380 N.E.2d 1243,

That revision (SDCL 57A–9–109(d)(10)) resolved the conflict in views and clarified that claims and defenses allowed by § 9–404 (2001) (formerly SDCL 57A–9–318), apply to a secured creditor and purchaser asserting setoff rights in the same collateral. SDCL 57A–9–109(d)(10) (2001) clarified that "[t]his chapter does not apply to . . . [a] right of recoupment or setoff, but . . . [s]ection 57A–9–404 applies with respect to defenses or claims of an account debtor." *Id.* Official Comment 14 to UCC § 9–109(d)(10) explains that this revised section "recognizes [s]ection 9–404 [formerly § 9–318], which affords the obligor on an account [IBP, the buyer and account debtor] . . . the right to raise claims and defenses against an assignee (secured party)." UCC § 9–109(d)(10) cmt. 14 (2002). "The revised text effectively equates a party asserting a set-off with an account debtor. This means that a priority conflict between an account debtor asserting a set-off right and a secured party asserting a security interest in the same asset will generally be worked out under the rules specified in UCC § 9–404(rev) [formerly § 9–318]." Eldon H. Reiley, Security Interests in Personal Property § 4:32 (3rd ed. 2003).

[¶ 20.] In light of this clarification and the majority view, we apply pre-revision SDCL 57A–9–318 to resolve this priority dispute between Consolidated's security interest and IBP's contractual right of set-off. Under that section, unless the account debtor (IBP, the buyer) had agreed to not assert its rights under the contract, the rights of an assignee (Consolidated, the secured party) are subject to the contractual agreement for the sale of collateral between the account debtor (IBP) and the assignor (Blochs, the sellers).[9] SDCL 57A–9–318(1)(a)–(b) (1997) provided in relevant part:

(1) Unless an account debtor [IBP] has made an enforceable agreement not to assert defenses or claims . . . *the rights of an assignee [Consolidated] are subject to:*

(a) *All the terms of the contract between the account debtor [IBP] and assignor [Blochs]* and any *defense or claim arising therefrom;* and

(b) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment. . . .

*Id.* (emphasis added).

[¶ 21.] Under this emphasized language in SDCL 57A–9–318(a)(1) (1997),

1247–48 (1978); *Bank of Kansas v. Hutchinson Health Servs., Inc.,* 12 Kan.App.2d 87, 735 P.2d 256, 260 (1987); *Maine Farmers Exch., Inc., v. Farm Credit of Maine, ACA,* 789 A.2d 85, 88–89 (Me.2002); *Southeastern Fin. Corp. v. Nat'l Bank of Detroit,* 145 Mich.App. 717, 377 N.W.2d 900, 900–01 (1985); *Morris Plan Co. of St. Joseph v. Broadway Nat'l Bank of Kansas City,* 598 S.W.2d 557 (Mo.Ct.App. 1980); *Associates Discount Corp. v. Fid. Union Trust Co.,* 111 N.J.Super. 353, 268 A.2d 330, 332 (1970); *Insley Mfg. Corp. v. Draper Bank & Trust,* 717 P.2d 1341, 1344–45 (Utah 1986); *First Wisconsin Nat'l Bank of Milwaukee v. Midland Nat'l Bank,* 76 Wis.2d 662, 251 N.W.2d 829, 833 (1977); David B. Harrison, J.D., Annotation, *Effect of UCC Article 9 Upon Conflict, as to Funds in Debtor's Bank Account, Between Secured Creditor and Bank Claiming Right of Setoff,* 3 A.L.R.4th 998 (1981).

9. IBP was the buyer and account debtor because it purchased the hogs, did not fully pay the seller, and was thereby obligated on account. SDCL 57A–9–102(3). Blochs were the sellers and assignors because they assigned their rights to the proceeds of the hog sale to IBP (by way of the hog procurement contract) and to Consolidated (by way of the security interest). Consolidated was the assignee, by way of the assignment to it of the right to receive payment from the sale of the hogs. *See Maine Farmers Exch.,* 789 A.2d 85 (applying UCC § 9–318).

IBP had priority over Consolidated's security interest in the proceeds of the hog sale because "an assignee [secured party] takes the right assigned subject to all terms of the agreement between the account debtor [buyer] and the assignor [seller]." 11 Ronald A. Anderson & Lary Lawrence, Anderson on the Uniform Commercial Code [Rev] § 9–404:4 [formerly § 9–318] (3rd ed. 1999). "The fact that [a creditor] had a perfected security interest ... makes no difference because [the secured party's] secured status comes into play only *after* it is shown that [the assignor] was entitled to payment of the funds." *Chrysler Realty Corp.*, 244 F.3d at 783. *See also Maine Farmers Exch.*, 789 A.2d at 89; *In re Apex Oil*, 975 F.2d at 1367–68; *Pioneer Commercial Funding Corp.*, 122 B.R. at 883.

[¶ 22.] This priority rule for claims or defenses like setoffs is, however, subject to one requirement. Under SDCL 57A–9–318(1)(a) (now § 9–404(a)(1)), a security interest is subject to a claim or defense of setoff only if the setoff arises out of and is part of the contract between the account debtor (IBP) and the assignor (Blochs). *Maine Farmers Exchange*, 789 A.2d at 89. Therefore, Consolidated's security interest was subject to IBP's contractual claim of setoff if the setoff arose

out of the same contract involving the hog sales. SDCL 57A–9–318(1)(a).

[¶ 23.] The same contract requirement was satisfied in this case. IBP's right to setoff arose out of the same hog procurement contract that governed the hog sales and the deficiency account. Because IBP's contractual right of setoff arose from the hog procurement contract, Consolidated's security interest was subject to the terms of that contract. One of those terms included IBP's right to setoff sale proceeds to satisfy the deficiency account. Therefore, Consolidated's security interest in the proceeds of the first hog sale was subject to IBP's contractual right of setoff. Because Consolidated's security interest in the second sale was subordinated under the FSA, IBP was entitled to summary judgment on Consolidated's claims.

[¶ 24.] We affirm.[10]

[¶ 25.] GILBERTSON, Chief Justice, KONENKAMP, Justice, AMUNDSON, Retired Justice, and DOBBERPUHL, Circuit Judge, concur.

[¶ 26.] DOBBERPUHL, Circuit Judge, sitting for SABERS, Justice, disqualified.

---

**10.** Consolidated also argued that the circuit court erred when it held that Consolidated could not bring this action against IBP unless it first filed a criminal conversion action against the Blochs, pursuant to SDCL 57A–9–609.1. SDCL 57A–9–609.1 provides:

> No cause of action for recovery of security or its value may be commenced by a secured creditor against an innocent third-party purchaser of farm products as defined in subsection (34) of § 57A–9–102, nor may such a cause of action be commenced against a livestock auction agency, as defined in chapter 40–15 and § 301 of the Packers and Stockyards Act (7 USC 201), or

> a public grain warehouse, or a public terminal grain warehouse, or a grain dealer as defined by chapters 49–43, 49–44, and 49–45 respectively, unless such action is commenced within twenty-four months from the date the farm products are sold and unless such action is preceded by the secured creditor offering to file against the debtor, a complaint as defined by § 23A–2–1.

*Id.* Because IBP prevails on the priority dispute, we need not address whether Consolidated was required to offer to file a criminal complaint against the Blochs.