#23982, #24001-aff in pt, rev in pt & rem-SLZ

**2008 SD 48**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

FIN-AG, INC.,            Plaintiff and Appellee,

  v.

PIPESTONE LIVESTOCK AUCTION

MARKET, INC.,            Defendant and Appellant,

  and

DACOTAH BANK,            Defendant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA
* * * *
HONORABLE GENE PAUL KEAN
Judge (Retired)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

[#23984-aff in pt, rev in pt & rem]

FIN-AG, INC.,            Plaintiff and Appellee,

  v.

SOUTH DAKOTA LIVESTOCK SALES

OF WATERTOWN, INC.,            Defendant and Appellant,

  and

DACOTAH BANK,            Defendant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA
* * * *
HONORABLE ROBERT L. TIMM
Judge

* * * *

ARGUED NOVEMBER 29, 2006
ORDER GRANTING REHEARING
PURSUANT TO SDCL 15-24-4
DECEMBER 17, 2007
ARGUED ON REHEARING
MARCH 28, 2008
OPINION FILED **06/18/08**

JASON W. SHANKS of
May & Johnson, PC
Sioux Falls, South Dakota

 and

JONATHAN K. VAN PATTEN
Vermillion, South Dakota                    Attorneys for appellees.

TIM R. SHATTUCK of
Woods, Fuller, Shultz & Smith, PC
Sioux Falls, South Dakota                   Attorneys for appellants.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(On Rehearing)

JONATHAN K. VAN PATTEN
Vermillion, South Dakota

and

JASON W. SHANKS of
May & Johnson, PC
Sioux Falls, South Dakota                   Attorneys for appellees.

MICHAEL J. SCHAFFER of
Schaffer Law Office, Prof. LLC
Sioux Falls, South Dakota

E. Lawrence Oldfield
Oldfield Fox & Sarna, PC
Oak Brook, Illinois                         Attorneys for appellants.

#23982, #24001, #23984

ZINTER, Justice

[¶1.]        These consolidated appeals arise out of separate but related actions for conversion.  Both actions were commenced by Fin-Ag, Inc., an agricultural lender, against two public livestock auction barns:  Pipestone Livestock Auction Market, Inc. (Pipestone) and South Dakota Livestock Sales of Watertown, Inc. (SD Livestock) (collectively referred to as Sale Barns).[1]  Fin-Ag alleged that it had a perfected security interest in cattle sold at Sale Barns under the name C&M Dairy, and that Sale Barns converted the collateral by failing to remit the sale proceeds to Fin-Ag.  In the action against Pipestone, the circuit court (Judge Kean, Retired) granted summary judgment in favor of Fin-Ag on some sales and in favor of Pipestone on other sales.  In the action against SD Livestock, the circuit court (Judge Timm) granted summary judgment in favor of Fin-Ag.  The principal difference between the courts' rulings involves different interpretations of the Food Security Act (FSA), 7 USC § 1631 (1985).  We agree with the Pipestone court's view of the FSA.  Nevertheless, because a SDCL 52A-9-609.1 statute of limitation question prevents a majority decision in favor of Fin-Ag on some FSA seller issues, and because of a number of conversion issues, both decisions are affirmed in part, reversed in part, and remanded for reconsideration consistent with this opinion.

---

1.      Fin-Ag also brought similar actions against other sale barns and purchasers of the same debtors' cattle.  *See* Fin-Ag, Inc. v. Watertown Livestock Auction, Inc., 2008 SD 49, ___ NW2d ___, and Fin-Ag, Inc. v. Cimpl's, Inc., 2008 SD 47, ___NW2d ___.

**I.**

[¶2.]        On June 27, 2002, Fin-Ag entered into an Agricultural Security

Agreement (ASA) with Berwald Brothers,[2] Calvin Berwald, Michael Berwald,

Kimberly Berwald, and Sokota Dairy, LLC (collectively Berwalds).  The ASA

granted Fin-Ag a security interest in collateral owned by Berwalds, including farm

products (cattle).  Under the ASA, all proceeds of cattle sales were to be jointly

payable to Berwalds and Fin-Ag.  The ASA also provided that no provision of the

ASA could be interpreted to authorize non-inventory sales of collateral unless

authorized by Fin-Ag in writing.

[¶3.]        On July 2, 2002, Fin-Ag filed a UCC Financing Statement with the

Secretary of State.  The parties agree that this qualified as an effective financing

statement (EFS) under the FSA.  The EFS identified Berwald Partnership, Calvin

Berwald, Michael Berwald, Kimberly Berwald, and Sokota Dairy, LLC as debtors.

Although all livestock and farm products were listed as collateral on the UCC-1, the

---

2.    Berwald Brothers is a general partnership, including Calvin and Michael
      Berwald as general partners.

      During the second oral argument in these cases, new counsel for Sale Barns
      observed that "Berwald Brothers" signed the ASA, but "Berwald Partnership"
      rather than "Berwald Brothers" was listed on the UCC-1/EFS.  The
      suggestion was made that this omission entitled Sale Barns to prevail.  This
      argument was not presented to the circuit court and was not briefed in this
      appeal.  We therefore decline to consider the argument, leaving it to the
      circuit courts on remand.  *See* Millard v. City of Sioux Falls, 1999 SD 18, ¶30,
      589 NW 2d 217, 221.  Because we decline to consider the issue, we also
      decline Fin-Ag's post-oral argument request to take judicial notice of an
      amendment to its UCC-1/EFS filing.

EFS portion of the financing statement only described the covered farm products as dairy cattle and milk.

[¶4.]     On August 26, 2002, Fin-Ag and Berwalds executed a promissory note in the amount of $460,000, and on January 8, 2003, they executed a second promissory note in the amount of $4,110,000.  The notes were secured by the collateral identified in the ASA.  On August 23, 2004, Berwalds defaulted on the promissory notes and filed Chapter 11 bankruptcy.

[¶5.]     Berwalds ultimately filed an amended plan of reorganization, which required Berwalds to pay Fin-Ag the entire balance of its loans plus interest, costs and Fin-Ag's attorney fees.  Fin-Ag accepted this plan, and Fin-Ag receives monthly payments of $35,034.09.  In the event Berwalds default on those payments, Fin-Ag has the right to immediately liquidate and sell its collateral to satisfy the remaining debt.  Fin-Ag acknowledges that the value of its collateral, including livestock, crops, equipment and real estate, exceeds the balance of the debt.

[¶6.]     These cases were commenced as a result of several pre-default sales of cattle at the Sale Barns.  Both Sale Barns are public auction barns (commission merchants) registered with the Secretary of State's central filing system for effective financing statements.  Therefore, each month they received portions of the master list identifying Fin-Ag's debtors and collateral subject to an EFS.  Most of the cattle at issue were, however, sold under the name C&M Dairy, which is a d.b.a. for Calvin and Michael Berwald, and Fin-Ag did not include C&M Dairy on its EFS.

[¶7.]     The Sale Barns' business practices were quite similar.  When cattle were delivered to each facility, a "yard man" asked the delivery person the name of

the seller. SD Livestock also requested the identity of the owner. For each of the sales at issue except two,[3] the yard man was informed that the seller and/or owner of the cattle was C&M Dairy. Based on this information, the yard man completed a consignment ticket or "dock-in sheet" identifying the seller as C&M Dairy. Office personnel then reviewed the most recent Secretary of State's master list to determine if C&M Dairy's name appeared. Because C&M Dairy was not listed as a debtor, Fin-Ag was not made a co-payee on the proceeds checks from the cattle sales. Instead, SD Livestock generally issued checks to C&M Dairy alone. Pipestone generally issued checks to either C&M Dairy or to itself on C&M Dairy's account to pay for C&M Dairy's cattle purchases at that facility.[4] Ultimately, none of the proceeds at issue were remitted to Fin-Ag by C&M Dairy, Berwalds or Sale Barns.

[¶8.] The following sales and purchases, involving the following sellers and payees, are involved in these appeals:

Transactions at Pipestone

February 5, 2004: **C&M Dairy sold** five head of cattle through Pipestone for $3,348.06. Pipestone then issued a check to C&M Dairy for $3,348.06.

February 10, 2004: **Calvin Berwald sold** one head of cattle through Pipestone for $851.99. Pipestone then issued one check

---

3. On February 10, 2004, Pipestone was notified that the seller was Calvin Berwald. On July 28, 2004, SD Livestock was notified that the seller was Michael Berwald.

4. Although there was no written agreement, C&M Dairy purchased cattle at Pipestone on account. Pipestone would then apply subsequent sale proceeds to C&M Dairy's account to pay for C&M Dairy's previously purchased cattle.

to Calvin Berwald for $351.99 and one check to C&L Farms for $500.[5]

February 19, 2004: **C&M Dairy purchased** four head of cattle for $4675.

February 24, 2004: **C&M Dairy sold** nine head of cattle through Pipestone for $5,221.51. Pipestone then issued one check to C&M Dairy for $546.51 and one check to itself for $4,675 to pay for cattle previously purchased by C&M Dairy.

March 18, 2004: **C&M Dairy purchased** six head of cattle for $7,575.

March 30, 2004: **C&M Dairy sold** twelve head of cattle through Pipestone for $8,045.79. Pipestone then issued one check to C&M Dairy for $470.79 and one check to itself for $7,575 to pay for cattle previously purchased by C&M Dairy.

April 15, 2004: **C&M Dairy purchased** fifteen head of cattle for $19,925.

April 20, 2004: **C&M Dairy sold** thirteen head of cattle through Pipestone for $12,538.20. Pipestone then issued a check to itself for $12,538.20 to pay for cattle previously purchased by C&M Dairy.

April 27, 2004: **C&M Dairy sold** ten head of cattle through Pipestone for $6,724.42. Pipestone then issued a check to itself for $6,724.42 to pay for cattle previously purchased by C&M Dairy.

Transactions at SD Livestock

July 24, 2002 - June 16, 2004: **C&M Dairy,** on forty-eight separate occasions, **sold** a total of 546 head of cattle for $272,581.85 through SD Livestock. SD Livestock issued checks to C&M Dairy for that amount.

---

5. Pipestone does not contest its liability for the $351.99 check issued to Calvin Berwald if this Court determines that Fin-Ag complied with SDCL 57A-9-609.1. Because we determine that Fin-Ag complied with SDCL 57A-9-609.1, we direct judgment in favor of Fin-Ag for this amount. Regarding the $500 check issued to C&L Farms, the parties have not briefed liability for this check, and therefore we decline to consider the issue on appeal.

> July 28, 2004: **Michael Berwald sold** thirteen head of cattle through SD Livestock for $12,007.60. SD Livestock then issued a check for $12,000.60 jointly payable to Michael Berwald and Dacotah Bank.

[¶9.] Fin-Ag initially sued Pipestone on December 17, 2004, and SD Livestock on January 4, 2005. In both cases, Sale Barns raised SDCL 57A-9-609.1 as a defense. That statute requires a lender such as Fin-Ag to "offer" to file a criminal complaint against its debtor before commencing a conversion action against an innocent third party. After apparently realizing that it had not offered to file a complaint before commencing the suits, Fin-Ag sent counsel for Sale Barns and Berwalds a letter, dated February 22, 2005, stating, "pursuant to SDCL 57A-9-609.1, Fin-Ag, Inc. hereby offers to file against the debtors, Berwald Partnership, Calvin Berwald, Michael Berwald, Kimberly Berwald, Sokota Dairy, LLC, a complaint as defined [in] SDCL 23A-2-1." After sending this letter, Fin-Ag re-filed and re-served identical summons and complaints on Sale Barns on March 10, 2005.

[¶10.] The parties filed cross-motions for summary judgment in both cases.

*The Pipestone court (Judge Kean)*

[¶11.] The Pipestone court held that: (1) Fin-Ag's offer complied with SDCL 57A-9-609.1; (2) C&M Dairy was the seller under the FSA; (3) because C&M Dairy was not a listed debtor on Fin-Ag's EFS, Pipestone took the cattle free of Fin-Ag's security interest under the FSA for the February 5, 2004 sale in which Pipestone acted as a commission merchant; (4) for the remaining sales, the FSA did not protect Pipestone because Pipestone was acting as a lender when it applied sale proceeds to C&M Dairy's account at Pipestone for prior purchases; and, (5)

-6-

Pipestone's application of the proceeds to its account interfered with Fin-Ag's security interest, rendered Pipestone liable for conversion, and Fin-Ag suffered compensable damages.

*SD Livestock court (Judge Timm)*

[¶12.]     The SD Livestock court held that: (1) Fin-Ag's offer complied with SDCL 57A-9-609.1; (2) Berwalds, not C&M Dairy, were the sellers under the FSA; (3) because Berwalds were listed as debtors on the EFS, SD Livestock had notice of, and was subject to, Fin-Ag's security interest under the FSA; and (4) SD Livestock was liable for conversion and Fin-Ag suffered compensable damages on all sales. Following our inability to reach a majority decision on a judgment on all FSA seller issues, both appeals were rebriefed and reheard pursuant to SDCL 15-24-4.

[¶13.]     Sale Barns appeal raising the following issues which we have restated:

1.     Whether Fin-Ag's offer to file a criminal complaint complied with SDCL 57A-9-609.1.

2.     Whether the FSA protected Sale Barns from liability for conversion.

3.     Whether Fin-Ag established entitlement to conversion.

Fin-Ag, by notice of review, contends that Pipestone was also liable for the February 5, 2004 sale by C&M Dairy, which Pipestone did not apply on account. Because all issues were decided on summary judgment we review them to:

> [D]etermine whether the moving party demonstrated the absence of any genuine issue of material fact and [established] entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party[,] and reasonable doubts should be resolved against the moving party. . . . Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied.

Consol. Nutrition, L.C. v. IBP, Inc., 2003 SD 107, ¶8, 669 NW2d 126, 129 (citations omitted) (alteration in original). We decide issues of law de novo. City of Colton v. Schwebach, 1997 SD 4, ¶8, 557 NW2d 769, 771.

## II.

### 1. SDCL 57A-9-609.1

[¶14.]    Before commencing an action for conversion against an innocent purchaser or a livestock auction agency dealing in farm products, a lender must first "offer" to file a criminal complaint against the debtor. SDCL 57A-9-609.1.[6] The lender must also commence the conversion action within twenty-four months of the sale.[7] *Id.*

---

6.    SDCL 57A-9-609.1 provides:

> No cause of action for recovery of security or its value may be commenced by a secured creditor against an innocent third-party purchaser of farm products as defined in subsection (34) of § 57A-9-102, nor may such a cause of action be commenced against a livestock auction agency, as defined in chapter 40-15 and § 301 of the Packers and Stockyards Act (7 USC 201), or a public grain warehouse, or a public terminal grain warehouse, or a grain dealer as defined by chapters 49-43, 49-44, and 49-45 respectively, unless such action is commenced within twenty-four months from the date the farm products are sold and unless such action is preceded by the secured creditor offering to file against the debtor, a complaint as defined by § 23A-2-1.

7.    SD Livestock points out that nine sales at that facility occurred prior to March 10, 2003, more than twenty-four months before the second action was commenced following the offer to file a criminal complaint. Consequently, SD Livestock argues that these nine transactions were time-barred by the twenty-four month statute of limitations in SDCL 57A-9-609.1. On appeal, Fin-Ag concedes that nine sales occurred more than twenty-four months before the filing of the second complaint and were time-barred. Fin-Ag

(continued . . . )

[¶15.]     Sale Barns argue that Fin-Ag's offer to file a complaint, in and of itself, did not comply with the statute.  They contend that *in addition to* the offer, the statute requires that a lender must also "advise" or "inform a South Dakota State's Attorney, the South Dakota Attorney General, or a law enforcement agency of its offer to file a criminal complaint."  Both circuit courts concluded that Fin-Ag's written offer was sufficient.  Because this is a matter of statutory construction, we review the matter de novo.  *In re* Estate of Jetter, 1997 SD 125, ¶10, 570 NW2d 26, 28.

[¶16.]     A fundamental rule of statutory construction is that "'the intention of the law is to be primarily ascertained from the language expressed in the statute.'"  Huber v. Dept. of Pub. Safety, 2006 SD 96, ¶14, 724 NW2d 175, 179 (quoting State v. $1,010 in Am. Currency, 2006 SD 84, ¶8, 722 NW2d 92, 94 (citation omitted)).  Furthermore, "'we may not, under the guise of judicial construction, add modifying words to the statute or change its terms.'"  City of Sioux Falls v. Ewoldt, 1997 SD 106, ¶13, 568 NW2d 764, 767 (quoting State v. Franz, 526 NW2d 718, 720 (SD 1995)).  "'[I]t is always safer not to add to or subtract from the language of a statute unless imperatively required to make it a rational statute.'"  *Id*. (quotation omitted).  "'The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said[.]'"  Martinmaas v. Engelmann, 2000 SD 85, ¶49, 612 NW2d 600, 611 (quotation omitted).

---

(. . . continued)
   agrees that summary judgment was incorrectly granted on those sales.
   Therefore, the judgment on those sales is reversed.

[¶17.]      These rules create an insurmountable barrier to Sale Barn's

argument. The statute fails to require that *in addition to* the offer, a State's

Attorney, the Attorney General, or a law enforcement agency must be "informed" or

"advised" that an offer was made to the buyer.[8] Because the statute does not

---

8.  It is significant that SDCL 57A-9-609.1 does not direct where the initial offer
    should be made. In light of this omission, it is reasonable to believe that the
    Legislature did not intend law enforcement entanglement at this civil stage
    of the controversy. It is reasonable because an innocent purchaser of
    collateral will only become a "victim" if the secured creditor continues to
    pursue the civil conversion action, thereby subjecting the purchaser to double
    liability. By failing to mandate law enforcement intervention at the offer
    stage of the civil controversy, the Legislature has given a potential victim a
    voice in the matter. The failure to mandate law enforcement intervention at
    this stage requires the secured creditor to communicate with an innocent
    victim, thereby allowing all parties to consider the consequences of their
    proposed actions before they become fully immersed in civil and criminal
    litigation.

    The dissent suggests the Legislature did not have these purposes in mind.
    Instead, the dissent suggests that the Legislature was concerned with
    *effective* law enforcement, and that failing to make an offer with a law
    enforcement agency would not result in an effective criminal prosecution
    thereby making the offer a useless act. *Infra* ¶¶49-50. There is, however,
    nothing in the text or history of the statute to support the dissent's
    speculation. If anything, the Legislature's enactment of this measure as a
    *statute of limitations* for the filing of a *civil action* suggests that effective
    criminal prosecution was not its motivation. This is confirmed by the title of
    the legislation of which SDCL 57A-9-609.1 was a part: "An Act to reenact the
    revised secured transactions article of the Uniform Commercial Code." *See*
    2000 SD Laws ch 231, § 9-609.1.

    The dissent also incorrectly suggests that because Sale Barns were "aware of
    Fin-Ag's claim to the proceeds from Berwalds' sale of cattle," the offer
    subjects parties to a criminal misprison of a felony offense. *Infra* ¶51. This
    argument fails to acknowledge the distinction between an action for civil
    conversion and a criminal action for the sale of mortgage property. The
    dissent is correct that at the time the offer is made under SDCL 57A-9-609.1,
    the secured creditor is simply "aware of [the secured creditor's] claim to the
    proceeds." *Id.* This is consistent with the pursuit of a civil action for
    conversion: the plaintiff need only be aware that an *innocent transferee* (in

    (continued . . . )

impose this additional step, we may not "add such language [] that is not there[.]" Hannon v. Weber, 2001 SD 146, ¶5, 638 NW2d 48, 49. Considering the absence of statutory language requiring Sale Barn's proposed additional step, we affirm the circuit courts' judgments' that Fin-Ag complied with the statute by making offers to the Sale Barns that it would file criminal complaints.

---

(. . . continued)

this case, a sale barn) has sold secured cattle. *See infra* ¶34. Awareness of wrongful conduct on the part of the debtor is immaterial. Rushmore State Bank v. Kurylas, Inc., 424 NW2d 649, 659 (SD 1988). Therefore, the knowledge necessary for a secured creditor to proceed with a civil conversion action is far less than the knowledge of wrongful criminal conduct necessary to know that a criminal sale of mortgaged property has occurred under SDCL 44-1-12. In the latter criminal offense, the secured creditor must not only know that an innocent party has obtained control of its collateral, but also that its *debtor* has *willfully* disposed of that collateral and its proceeds. *Id.* Considering this distinction, considering the short occurrence statute of limitations, and considering the substantial time that often expires before a secured creditor is even aware of a debtor's disposition of collateral, it is inconceivable that the Legislature would have intended criminal consequences for a secured creditor's act of making the statutory offer before it had criminal knowledge of the circumstances under which its debtor participated in the sale. More importantly, regardless of the interpretation of SDCL 57A-9-609.1, the statute does not alter a person's duty to report if the person has the requisite level of knowledge that a felony has been committed. The misprison duty remains under either interpretation.

Finally, the dissent's suggestion that "[o]ur Legislature has not condoned the practice" of "attempting to negotiate an arrangement that might avoid law enforcement intervention," *see infra* ¶¶53-54 is simply incorrect. The Legislature often requires civil notice and negotiation to avoid law enforcement involvement after the commission of a crime but before a prosecution is commenced. In the area of theft alone, the Legislature has mandated similar civil notices in three instances. *See* SDCL 22-30A-32 (requiring a civil notice of dishonor and opportunity to pay an insufficient funds or no account check before the criminal prosecution is commenced); SDCL 22-30A-40-44 (requiring similar preliminary civil efforts to resolve criminal motor vehicle fuel theft); and SDCL 22-30A-19.3 (involving preliminary civil demands in retail theft).

## 2.    *FSA Protection for Farm Products Purchased*
### *in the Ordinary Course of Business*

[¶18.]    The next issue is whether the FSA preempted the state law conversion actions and allowed the Sale Barns to take free of Fin-Ag's security interests.  Sale Barns argue that they are entitled to FSA protection from conversion because: C&M Dairy was the seller of the cattle; C&M Dairy was not on the master list of effective financing statements identifying Fin-Ag's debtors and collateral; and therefore Sale Barns did not have the written notice necessary to disqualify them from protection under the FSA.

[¶19.]    Fin-Ag, on the other hand, argues that Berwalds, not C&M Dairy, were the sellers of the cattle, and that because Berwalds were on the master list, Sale Barns had written notice of Fin-Ag's security interest disqualifying Sale Barns from protection under the FSA.  Alternatively, Fin-Ag argues that even if C&M Dairy were considered the seller for purposes of notice, Sale Barns are still not protected because the FSA limits the Sale Barns' protection to taking free of security interests "created by the seller."  7 USC § 1631(d).  And, Fin-Ag contends that C&M Dairy did not create the security interest, Berwalds did.

[¶20.]    We thoroughly addressed these same "seller" issues involving Fin-Ag and virtually identical sales by C&M Dairy and Berwalds in *Fin-Ag, Inc. v. Cimpl's, Inc.,* 2008 SD 47, ___ NW2d ___.[9]  We concluded that the FSA provided these buyers of farm products protection from conversion because:  C&M Dairy was the

---

9.    Although Sale Barns are commission merchants unlike the buyer involved in *Cimpl's*, the applicable provisions of the FSA are the same.  *Compare* 7 USC § 1631(d)(e) and § 1631(g).

seller;[10] C&M Dairy was not on the master list giving buyers notice of Fin-Ag's security interest; and because C&M Dairy was the alter ego of the Berwalds, C&M Dairy was regarded as having created the security interest within the meaning of 7 USC § 1631(d). *Id.*

[¶21.] In the instant cases all but two sales[11] were made under the name C&M Dairy. Further, like the situation in *Cimpl's*, C&M Dairy was the alter ego (a d.b.a.) of Berwalds. Accordingly, for the reasons expressed in *Cimpl's*, we again conclude that to the extent Sale Barns took the cattle sold by C&M Dairy,[12] it took

---

10. The relevant facts in *Cimpl's* are also within the Pipestone/SD Livestock record. In addition to the facts present in *Cimpl's*, this record further indicates that C&M Dairy was the seller. Calvin Berwald's deposition testimony reflected:

> C&M Dairy was our cattle business, and Pipestone Livestock—I mean I bought thousands of cattle from that barn when I was in the cattle business. The only way they knew us was by C&M Dairy.
> . . .
> I don't think we ever sold anything at that place that wasn't listed and [sic] C&M Dairy.
> . . .
> C&M Dairy was our Clear Lake facility which we used mostly for buying and selling cattle. I mean we used that—that deal for, I mean, I suppose ten years. There was a milk permit under there, too.

11. The two exceptions are the February 10, 2004 sale by Calvin Berwald at Pipestone and the July 28, 2004 sale by Michael Berwald at SD Livestock.

12. In determining who was the seller, the SD Livestock court failed to consider that the Berwalds had been doing business as C&M Dairy for a considerable period of time. The FSA requires that the master list must give notice that the "seller" is subject to an EFS. 7 USC 1631(e)(3). And, an EFS must identify all persons who are "indebted to the secured party." 7 USC 1631 (c)(4)(C). This would include Calvin and Michael Berwald d.b.a. C& M Dairy.

them free of Fin-Ag's security interest under the FSA, and Sale Barns cannot be liable for conversion.[13] We therefore reverse the judgment against SD Livestock for the July 24, 2002—June 16, 2004 sales by C&M Dairy. Because Michael Berwald was the seller on the July 28, 2004 sale, and because Michael Berwald was identified on Fin-Ag's EFS, the notice exception applied, and SD Livestock was not entitled to FSA protection for that sale. Liability for that sale is governed by our discussion of state law conversion in Issue 3, *infra.*

---

13.     Fin-Ag argues that Sale Barns knew, or should have known that C&M Dairy was, in fact, Berwalds. The basis of this argument is an investigation conducted by Fin-Ag wherein Pipestone admitted that Calvin Berwald was the individual who delivered the cattle for sale at Pipestone. In that investigation, Pipestone also admitted that Calvin Berwald directed Pipestone how the cattle sale proceeds should be paid. Fin-Ag points out that Pipestone would issue proceeds checks to C&M Dairy but use the same mailing address that it used for sales made by Calvin Berwald. Moreover, there is a dispute as to whose name was on the Pipestone account, Berwalds or C&M Dairy. Finally, the checks issued to C&M Dairy were endorsed by either Calvin or Michael Berwald. A similar argument applies to SD Livestock.

These allegations, however, do not create a genuine issue of material fact for trial. "'A disputed fact is not 'material' unless it would affect the outcome of the suit under the governing substantive law.'" Weitzel v. Sioux Valley Heart Partners, 2006 SD 45, ¶17, 714 NW2d 884, 891 (citation omitted). Here, even if Sale Barns had actual knowledge that C&M Dairy consisted of Berwalds, they still did not have written notice from the master list that C&M Dairy was subject to Fin-Ag's security interest under 7 USC § 1631(g)(2)(D)(i)(ii). Sale Barns had no additional duty to check public records to determine the precise legal relationship between the Berwalds and C&M Dairy. Because Sale Barns had no duty to determine the legal relationship between Berwalds and C&M Dairy, and because actual knowledge of the security interest is irrelevant, [*Cimpl's,* 2008 SD 47, ¶15, ___NW2d ___,] these allegations did not create a genuine issue of material fact preventing summary judgment on this issue.

[¶22.]     For the same reasons, Pipestone is protected by the FSA for C&M Dairy's sales, and the judgment in favor of Pipestone is affirmed to the extent Pipestone paid the proceeds of the sales to C&M Dairy (the February 5, 2004 sale). FSA protection is not, however, automatically extended to the remaining sales where Pipestone retained the proceeds to satisfy C&M Dairy's antecedent debt for prior cattle purchases. We now discuss Pipestone's liability for those proceeds under the framework set forth in *Consolidated Nutrition,*, 2003 SD 107, 669 NW2d at 126.

*Acting as a Lender or as a Buyer in the Ordinary Course*

[¶23.]     The Pipestone court concluded that to the extent Pipestone applied the proceeds on account, it was acting as a lender, not as a "buyer in the ordinary course of business." Those sales occurred on February 24 ($4,675), March 30 ($7,575), April 20 ($12,538.20), and April 27, 2004 ($6,724.42). The Pipestone court concluded that there was no FSA protection for those sales, noting that they involved a priority dispute over proceeds governed by the Uniform Commercial Code. We agree.

[¶24.]     Although a buyer in the ordinary course is generally protected by the FSA, it loses that protection when it acts as a lender by retaining sale proceeds to satisfy an antecedent debt. *Consolidated Nutrition*, 2003 SD 107, ¶15, 669 NW2d at 131. A "'buyer in the ordinary course' [is entitled to protection] under the FSA to the extent that it purchase[s] the [farm products] and [pays the seller]. However, [the buyer is] not entitled to that [protection] to the extent [ ] it act[s] as a creditor and sets off the sale proceeds to satisfy [the seller's] preexisting debt." *Id*. ¶14.

The application of proceeds to a preexisting debt is not protected by the FSA because the buyer is not acting as a "buyer in the ordinary course." *Id.* ¶12.

> 'Buying' does not include receiving goods or document of title under a preexisting contract as security 'for or in total or partial satisfaction of a money debt,' SDCL 57A-1-201(9), thereby excluding 'attaching creditors and others who take goods in satisfaction of preexisting debts' from the definition of 'buyer in ordinary course.'

*Id.* (citing Farmers & Merchants State Bank v. Teveldal, 524 NW2d 874, 878 (SD 1994) (citing 2 James White & Robert Summers, *Uniform Commercial Code* § 26-13, at 533 n2 (3rd ed 1988))). Because the FSA does not provide protection for such buyers and commission merchants, the Pipestone court was correct in concluding that the Uniform Commercial Code determined the priority of Fin-Ag's and Pipestone's conflicting claims.

[¶25.] Pipestone, however, argues that *Consolidated Nutrition* does not apply because this is a Minnesota transaction not governed by South Dakota law. We disagree. Even if Minnesota had the most significant relationship with these transactions (the Pipestone transactions occurred in Minnesota and involved a Minnesota sale barn) and Minnesota law applied, Pipestone's argument is misplaced. *Consolidated Nutrition* involved an interpretation of the FSA, a federal enactment that is applicable in both States. Furthermore, Fin-Ag has cited no conflicting Minnesota interpretation of the FSA.

[¶26.] Alternatively, Fin-Ag argues that *Consolidated Nutrition* is distinguishable because the hog procurement contract in that case is different than C&M Dairy's purchases on account. We again disagree. Pipestone allowed C&M Dairy to purchase cattle "on account" and Pipestone subsequently used the proceeds

from future sales to pay the debt due on that account. Although there was no written contract as in *Consolidated Nutrition*, there was an open account that created an implied contract requiring payment for the antecedent debt. *See* SDCL 53-01-3 (providing that an implied contract is one whose "existence and terms . . . are manifested by conduct").

[¶27.]        Because the FSA governs farm products purchases rather than priority disputes between competing lenders, this Court concludes that Pipestone had no FSA protection for those proceeds it paid to itself on account for C&M Dairy's prior purchases. Therefore, the Pipestone court is affirmed on this issue, and Pipestone's liability for conversion on the transactions involving proceeds is governed by Issue 3, regarding conversion under state law. Before addressing that issue, however, one FSA issue remains: whether Fin-Ag's EFS description of the collateral was insufficient.

*EFS Description of the Collateral under the FSA*

[¶28.]        SD Livestock raises this issue as an alternative argument for FSA protection. For a creditor to be entitled to the notice exception to buyer protection under the FSA, the EFS must not only give notice of the seller, but also the collateral. 7 USC § 1631(g)(2)(D)(i)(ii). Therefore, even if Fin-Ag provided notice of the seller in its EFS as required by the FSA, Fin-Ag's EFS must have also adequately described the cattle. SD Livestock contends that Fin-Ag's EFS was insufficient because it only listed "dairy cattle" as collateral, whereas many of the cattle sold were not dairy cattle. Relying on the sales tickets, SD Livestock points out that many sales involved: "white-face, red, cross-bred, Charolais, and

Charolais-cross" cattle. SD Livestock contends that these are not dairy cattle, and the circuit court's denial of FSA protection must be reversed and remanded because the circuit court assumed that all of the cattle sold were dairy cattle.

[¶29.] The EFS must contain "a description of the farm products subject to the security interest created by the debtor, including the amount of such products where applicable; and a reasonable description of the property." 7 USC § 1631(c)(4)(D)(iv). A statement that substantially complies with this requirement, "even though it contains minor errors that are not seriously misleading," will qualify as an EFS. 7 USC § 1631(c)(4)(I). The question is whether Fin-Ag's collateral description of "dairy cattle" was seriously misleading. Although minor errors that are not seriously misleading will not invalidate an EFS, this error could qualify as seriously misleading if a distinction between dairy and other cattle is recognized in the cattle industry.

[¶30.] This issue is complicated by the United States Secretary of Agriculture's regulations and interpretive opinions,[14] as well as the South Dakota Secretary of State's implementing rules, which only offer two category descriptions for cattle: "dairy cattle" or "beef cattle." There is no generic "cattle" description available under the South Dakota rules.[15] As previously noted, however, SD

---

14.  *See generally* CFR § 205.106.

15.  According to South Dakota's filing procedures, a secured party completing an EFS must list a code for the farm products by selecting a code from a list provided. *See* Chris Nelson, Secretary of State, *UCC Filing Procedures* (2003). Notably, there is no EFS code listed for "cattle." Instead, there are separate codes for "beef cattle" and "dairy cattle." *Id.* Fin-Ag's EFS listed only "dairy cattle and milk." The cattle at issue here would have most likely

(continued . . . )

Livestock raises this issue as an alternative argument for FSA protection. Therefore, it need only be addressed to the extent one concludes that there is no FSA protection because C&M Dairy was not the seller who must be regarded as having created the security interest.

[¶31.]    In this case, SD Livestock is generally entitled to FSA protection because C&M Dairy was the seller who must be regarded as creating a security interest in all but one relevant sale (the July 28, 2004 SD Livestock transaction in which Michael Berwald sold 13 head of cattle). And on that transaction, SD Livestock's sales ticket reflects that all cattle were dairy cattle. Therefore, the dairy cattle description was not misleading, the notice exception applied, and SD Livestock was not entitled to FSA protection for that sale. Because all of the remaining SD Livestock sales involving different types of cattle were otherwise protected by the FSA, we need not decide the collateral description issue for those sales.

### 3. Conversion

[¶32.]    Under this writing, the FSA did not protect Pipestone in the transactions in which it was acting as a lender or the February 10, 2004 Calvin Berwald sale. Nor did the FSA protect SD Livestock for the July 28, 2004 Michael Berwald sale. Under Justice Sabers' writing, additional sales would not be

_____

(. . . continued)
    been covered by the EFS if Fin-Ag would have listed the codes and descriptions for both "dairy cattle" and "beef cattle." However, by listing only the "dairy cattle" code and description, Fin-Ag may have excluded other types of cattle.

protected by the FSA. Sale Barns next argue that even if they were not protected by the FSA, Fin-Ag failed to make sufficient summary judgment showings to support the judgments for conversion.[16] Sale Barns specifically contend Fin-Ag failed to prove that: (1) the cattle sold were cattle owned by Berwalds subject to Fin-Ag's security interest; (2) the sales were unauthorized; and (3) Fin-Ag suffered compensable damages, or alternatively, that compensable damages could have reasonably been avoided or mitigated.

[¶33.]     To prevail on summary judgment, "a plaintiff must establish each element of his or her prima facie case." Hatchett v. Philander Smith College, 251 F3d 670, 674 (8thCir 2001) (citation omitted). "'[T]hose resisting summary judgment must show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof.'" Bordeaux v. Shannon County Schools, 2005 SD 117, ¶14, 707 NW2d 123, 127 (quoting Chem-Age Indus., Inc. v. Glover, 2002 SD 122, ¶18, 652 NW2d 756, 765 (citation omitted); *see also* Celotex Corp. v. Catrett, 477 US 317, 322-323, 106 SCt 2548, 2552, 91 LEd2d 265, 273 (1986) (stating that entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial). Therefore, to prevail on the various claims and defenses, Fin-Ag must have submitted sufficient evidence to establish the elements

---

16.     The parties have not raised a choice of laws issue. They have briefed and argued this matter under South Dakota law. We therefore generally review the matter under South Dakota law.

of conversion, and Sale Barns must have submitted sufficient evidence to establish its affirmative defenses. Sufficient evidence requires establishment of a prima facie case. Mushitz v. First Bank of South Dakota, N.A., 457 NW2d 849, 859 (SD 1990). "[A] prima facie case has been established [when] there 'are facts in evidence which if unanswered would justify persons of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain.'" Sandner v. Minnehaha County, 2002 SD 123, ¶13, 652 NW2d 778, 783 (quoting Rosen's Inc. v. Juhnke, 513 NW2d 575, 577 (SD 1994)).

[¶34.]     "Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right." Chem-Age Indus., Inc. v. Glover, 2002 SD 122, ¶20, 652 NW2d 756, 766 (citation omitted). In general, a transferee who takes secured collateral from a debtor takes it subject to the creditor's security interest and can be held liable for conversion. Rushmore State Bank v. Kurylas, Inc., 424 NW2d 649, 659 (SD 1988) (citing UCC 9-306, cmt 3). A cause of action for conversion exists against an auction agency based on the debtor's lack of authority to sell the collateral. Sanborn County Bank, Inc. v. Magness Livestock Exch., Inc., 410 NW2d 565, 567 (SD 1987) (citations and emphasis omitted). Therefore, a "'commission merchant who receives property from his principal, sells it under the latter's instructions and pays him the proceeds of the sale, is guilty of a conversion if his principal had no title thereto or right to sell the property.'" Id. (quotation omitted). The basis of the liability for conversion is the fact that the commission merchant stands in the shoes of his principal. Id. (citations omitted). It is

immaterial that the agent had neither knowledge nor notice that the principal was committing a wrong by the sale. *Id.*

*Were These Berwalds' Cattle Subject to Fin-Ag's Security Interest*

[¶35.]     To be entitled to summary judgment, Fin-Ag must have first made a prima facie showing that the cattle sold were Berwald cattle subject to Fin-Ag's security interest. To make that showing, Fin-Ag offered a deposition of Calvin Berwald, taken in a bankruptcy proceeding, as evidence of Berwalds' ownership of the cattle. Sale Barns objected to the use of this deposition. Sale Barns point out that they were neither present nor represented at this deposition, nor did they have notice of the deposition. In fact, they were not even aware of a potential claim against them at the time of this deposition. Therefore, they contend the deposition could not be used against them under SDCL 15-6-32(a). Sale Barns also allege that even if the deposition is considered, it does not supply evidence that Berwalds owned the specific cattle sold in each of these transactions.

[¶36.]     At the summary judgment stage, however, even assuming that the deposition could not be used, Fin-Ag was only required to establish a prima facie case; i.e. sufficient facts which if unanswered would justify persons of ordinary reason and fairness in believing that these were collateral cattle owned by Berwalds. *See Sandner,* 2002 SD 123, ¶13, 652 NW2d at 783. In our view, aside from the Calvin Berwald deposition, Fin-Ag established a prima facie case.

[¶37.]     Regarding Pipestone, Fin-Ag showed:  (1) that Pipestone withheld money from the C&M Dairy sales because Calvin Berwald owed money for prior cattle purchases; (2) that Calvin Berwald directed where C&M Dairy's proceeds

should be sent; and (3) that the proceeds checks were endorsed by Calvin or Michael Berwald.  Regarding SD Livestock, the payments made to C&M Dairy were also sent to the Berwalds home and were endorsed by Calvin or Michael Berwald.  This evidence, if unanswered, would justify a person of ordinary reason in believing that Berwalds had an ownership interest in the cattle that was subject to Fin-Ag's security interest.  Furthermore, Sale Barns did not identify contradictory evidence.  Instead, they only *argue* that Fin-Ag's showing was insufficient.  This argument overlooks the minimal quantum of proof necessary to make a prima facie showing.  We conclude that a prima facie case was established, that Sale Barns did not identify conflicting facts, and the circuit courts did not err in explicitly (or implicitly) deciding that the sales at issue involved Berwalds' cattle subject to Fin-Ag's security interest.

*Unauthorized (and Authorized) Sales*

[¶38.]    Sale Barns next contend that Fin-Ag failed to make a sufficient summary judgment showing that the sales were unauthorized.  This issue encompasses both the elements of conversion and defenses. As an element of its conversion claim, Fin-Ag must have established that the sales were unauthorized; i.e. that Sale Barns exercised unauthorized control or dominion over Fin-Ag's collateral.  *Chem-Age Indus.,* 2002 SD 122, ¶20, 652 NW2d at 766. On the other hand, Sale Barns had the burden of establishing its defenses, i.e., that through its conduct, Fin-Ag authorized or waived its interests in the sales.  Aberdeen Prod. Credit Ass'n v. Redfield Livestock Auction, Inc., 379 NW2d 829, 831 (SD 1985).

[¶39.]          Fin-Ag established its prima facie case of showing unauthorized sales through: (1) the ASA, which prohibited non-inventory sales without the written consent of Fin-Ag, and (2) the affidavit of Robert Goetz, the operations manager of Fin-Ag, who stated that Berwalds were not authorized to sell cattle under the name C&M Dairy.  Furthermore, Sale Barns did not identify conflicting facts.  Instead, they again only *argued* the defense that Fin-Ag authorized the sales through another provision of the ASA permitting inventory sales in the ordinary course of business.  Sale Barns, however, offered no facts establishing a prima facie case that these cattle involved authorized sales of inventory.  We therefore conclude that Fin-Ag met its burden showing that the sales were unauthorized.

[¶40.]          Sale Barns next raise the defense that these were authorized sales in which Fin-Ag waived its rights because Fin-Ag impliedly allowed Berwalds to sell over 2,000 head of cattle through C&M Dairy to various buyers over the course of two years, while never requiring that Fin-Ag be included as a co-payee.[17]  Implied

---

17.     Sale Barns also argue that the sales were authorized, and Fin-Ag's interests were waived or extinguished because Fin-Ag had no security interest as a result of its failure to amend its financing statement/EFS to reflect material changes under 7 USC § 1631(c)(4)(D).  However, we need not address the FSA aspects of this issue because we have already determined that Sale Barns are generally entitled to FSA protection.

To the extent that a failure to amend the financing statement may arise under the UCC on remand, the parties may litigate that issue.  Judge Kean did not address the issue in his decision.  Although Judge Timm addressed it, there are material issues of disputed fact precluding summary judgment on the issue of the duty to amend a financing statement (as well as an EFS).  Those facts include allegations that Fin-Ag should have been aware that C&M Dairy was making substantial cattle sales in the region under the name C&M Dairy.  There was also a prior lawsuit in which Fin-Ag acknowledged that C&M Dairy was a d.b.a. for Berwalds business.  *See infra* n18.  These

(continued . . .)

authorization is a defense. *See Aberdeen Prod. Credit,* 379 NW2d at 834. Sale

Barns support this implied authorization defense with evidence suggesting that

Fin-Ag should have known Berwalds were selling these cattle through C&M

Dairy.[18] Fin-Ag responds with the ASA's requirement of a written authorization

and the affidavit of Goetz. Although these conflicting facts relating to Fin-Ag's

knowledge and conduct might, in other legal contexts, create an issue of fact

relating to implied authorization, implied authorization through course of dealing is

not recognized as a matter of law in this UCC context. An implied authorization to

sell collateral is not recognized in either South Dakota or Minnesota if it is contrary

to the express provisions of the security agreement. *Aberdeen Prod. Credit*, 379

NW2d at 832, *Wabasso State Bank v. Caldwell Packing Co.*, 308 Minn 349, 356**,** 251

---

(. . . continued)

    facts are relevant to determine whether Fin-Ag should have amended its financing statement (or EFS) to preserve its security interest. Whether Fin-Ag's research of alleged unauthorized cattle sales was reasonably sufficient to not require amendment is a question of fact that is not appropriate for summary judgment. Considering the conflicting facts, at the summary judgment stage, Judge Timm erred in finding that Fin-Ag's research was sufficiently reasonable.

18.    On October 4, 2002, an un-related lawsuit was brought against Berwalds, "d/b/a C&M Dairy" and Fin-Ag, Inc. This lawsuit, Fin-Ag responds, did not pertain to the sale of cattle by Berwalds under the name C&M Dairy; instead, it concerned a debt for consulting services and breach of a loan agreement. However, the lawsuit arose when Calvin and Michael Berwald d/b/a C&M Dairy entered into a purchase agreement in which they sold 150 head of cattle to R&J Van Beek, LLC. The purchase order, incorporated into the complaint, specifically listed C&M Dairy as the seller. R&J Van Beek, LLC commenced the action against Berwalds, specifically Calvin and Michael Berwald d/b/a C&M Dairy, over this purchase agreement. Fin-Ag was also a named party in the lawsuit. In its answer in that lawsuit, Fin-Ag admitted that Berwalds, d/b/a C&M Dairy, owned and operated a dairy operation in

(continued . . . )

NW2d 321, 325 (MN 1976).[19]  Therefore, Sale Barns' showings did not raise a material issue of disputed fact relating to its defense of implied authorized sales of cattle.

*Damages*

[¶41.]      Damages are a basic prerequisite to recovery on a conversion theory. "[T]he foundation for the action of conversion . . . rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff *from which injury to the latter results.*"  *Chem-Age Indus., Inc.*, 2002 SD 122, ¶20, 652 NW2d at 766 (emphasis added).  As the party seeking to recover damages, Fin-Ag bears the burden of proving damages "'with reasonable certainty.'"  Kobbeman v. Oleson, 1998 SD 20, ¶6, 574 NW2d 633, 635 (quotation omitted).  SDCL 21-3-3[20]

---

(. . . continued)

    Toronto, South Dakota.  Following this acknowledgment, Fin-Ag did not amend its financing statement to include C&M Dairy as a debtor.

19.    Sale Barns also argue Fin-Ag authorized the sales under SDCL 57A-9-315(a)(1), providing that although a security interest continues in collateral notwithstanding its sale, its disposition may be authorized.  Because this statute was not raised before the circuit courts, we decline to review this argument for the first time on appeal.  *See* State v. Olson-Lane, 2001 SD 51, ¶6, 624 NW2d 833, 834; Beckel v. Gerber, 1998 SD 48, ¶24, 578 NW2d 574, 579.

20.    SDCL 21-3-3 provides:

    The detriment caused by the wrongful conversion of personal property is presumed to be:
    (1) The value of the property at the time of the conversion, with the interest from that time;
    (2) Where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party;

(continued . . . )

creates a presumption that damages were incurred "at the time of the conversion . . ." and allows fair compensation for the time and money expended in pursuit of the property. However, the presumption does not eliminate the need for a conversion plaintiff to allege and present proof of actual harm. Security State Bank v. Benning, 433 NW2d 232, 234-35 (SD 1988). "It is fundamental that damages which are uncertain, contingent or speculative cannot be made the basis of recovery." Kunkel v. United Sec. Ins. Co. of N.J., 84 SD 116, 135, 168 NW2d 723, 733 (1969).

[¶42.]       Sale Barns argue that in the event we conclude Fin-Ag established a prima facie case of conversion, Fin-Ag failed to establish compensable damages. They contend that all of the proceeds from the sales were returned to the dairy operation for which Fin-Ag made the loans. Sale Barns also contend that Fin-Ag suffered no damages because they will be made whole in the Berwald bankruptcy. Sale Barns point out that Fin-Ag is an over-secured creditor, and under the confirmed bankruptcy plan, Fin-Ag is scheduled to receive the balance of the indebtedness plus interest and attorney's fees. Sale Barns further point out that Fin-Ag still retains an interest in Berwalds' collateral. Thus, Sale Barns contend that Fin-Ag will be able to liquidate and sell the secured collateral to cover the loans

---

(. . . continued)

(3) A fair compensation for the time and money properly expended in pursuit of the property.
Such presumptions cannot be repelled in favor of one whose possession was wrongful from the beginning by his subsequent application of the property to the benefit of the owner, without his consent.

should the plan not be completed. Sale Barns finally contend Fin-Ag failed to avoid and/or mitigate their damages.

[¶43.]    The circuit courts did not, however, consider each of these issues. Additionally, on remand, a defense relating to conversion may be decided such that the issue of damages need not be reached. We therefore decline Sale Barns request to direct summary judgment on damages. The damage issues are remanded for consideration by the circuit courts. *See Aberdeen Prod. Credit*, 379 NW2d at 832-33.

[¶44.]    For the foregoing reasons, we

1.    Affirm both courts' conclusions that Fin-Ag's offers complied with SDCL 57A-9-609.1;

2.    Although there are not three votes to affirm any FSA seller issue involving C&M Dairy in favor of Fin-Ag, there are three or more votes and we therefore (to the extent not otherwise covered by this opinion) generally affirm the result of the Pipestone court judgment in favor of Pipestone and reverse the result of the SD Livestock court judgment against SD Livestock;

3.    Affirm the Pipestone court's conclusion that the FSA did not protect Pipestone for those sales in which it applied proceeds to C & M Dairy's account;

4.    Pursuant to the parties' agreement, reverse the SD Livestock court's judgment regarding the nine sales that occurred prior to March 10, 2003; and,

5.       Reverse and remand the judgments on any non-FSA protected sales for further proceedings consistent with this Court's opinion on the conversion issues.

[¶45.]       MEIERHENRY, Justice, concurs.

[¶46.]       GILBERTSON, Chief Justice dissents in part and concurs in result in part.

[¶47.]       SABERS and KONENKAMP, Justices, dissent in part and concur in result in part.


GILBERTSON, Chief Justice (dissenting in part and concurring in result in part).[21]

[¶48.]       I respectfully disagree with the Court's analysis of issue one.  The Court's result should be derived from, and its opinion should end with, the analysis of this issue.  I would dismiss both proceedings for failure of the plaintiff to comply with the mandatory dictates of SDCL 57A-9-609.1.

[¶49.]       The Court is mistaken in its interpretation of SDCL 57A-9-609.1.  Its rationale, in footnote 8, for holding that Fin-Ag complied with the statutory prerequisite for filing a cause of action by sending a letter to counsel for Sale Barns and Berwalds offering to file a criminal complaint, exceeds the bounds of statutory-interpretation authority vested in the courts.  *See* Martinmaas v. Engelmann, 2000

---

21.    Because, in my view, Fin-Ag failed to comply with SDCL 57A-9-609.1, all sales are governed by that statute and the suits are barred.  Therefore, I generally dissent, concurring in result only in:  (1) those sales in Pipestone in which Judge Kean held in favor of Pipestone; and, (2) those sales in SD Livestock in which the Court reverses Judge Timm.

SD 85, ¶49, 612 NW2d 600, 611 (opining that statutory intent is to be determined from what the Legislature said, rather than what the courts think it said) (citation omitted). Ultimately, the Court's holding means that the statute can be satisfied by a meaningless act. *See* City of Sioux Falls v. Ewoldt, 1997 SD 106, ¶17, 568 NW2d 764, 768 (the court's obligation is to interpret law in a manner avoiding absurd results); Yankton Ethanol, Inc. v. Vironment, Inc., 1999 SD 42, ¶15, 592 NW2d 596, 599 (citing the well established precept that "[t]here is a presumption against a construction which would render a statute ineffective or meaningless[ ]") (quoting *In re* Real Estate Tax Exemption for Black Hills Legal Services, Inc., 1997 SD 64, ¶12, 563 NW2d 429, 432; Rapid City Ed. Ass'n v. School Dist., 522 NW2d 494, 498 (SD 1994) (citing Nelson v. Sch. Bd. of Hill City Sch. Dist., 459 NW2d 451, 455 (SD 1990)). *See also* Scott v. North Dakota Workers Comp. Bureau, 587 NW2d 153, 156 (ND 1998) (it is presumed the legislature acts with a purpose and does not perform useless acts); Bickel v. Jackson, 530 NW2d 318, 320 (ND 1995) (there is a presumption the legislature acts with purpose and does not perform idle acts).

[¶50.]       Either the Attorney General, a State's Attorney or law enforcement are authorized to act upon a request to file a criminal complaint. An offer to file a criminal complaint, made to a party or agency without authority to act upon it, has no effect. Counsel for Sale Barns and Berwalds had neither the authority nor obligation to commence a criminal proceeding that would be filed pursuant to SDCL 23A-2-1, as required by SDCL 57A-9-609.1. Thus, Fin-Ag's letter to counsel offering

-30-

to file the complaint was ineffectual and failed to satisfy the statutory mandate. To find that this "offer" to file a complaint satisfied the statutory prerequisite to filing a cause of action is to conclude that SDCL 57A-9-609.1 can be satisfied by any irrelevant act, no matter how unlikely it is to lead to calling the attention of the appropriate law enforcement authorities to the situation.

[¶51.]     Moreover, and more seriously, the Court's interpretation of SDCL 57A-9-609.1 places future parties in jeopardy of violating our misprision of felony statute, SDCL 22-11-12. Sale Barns, Berwalds and Fin-Ag were aware of Fin-Ag's claim to the proceeds from Berwalds' sale of cattle by the date of the summons and complaint in this action and notice of offer to file a criminal complaint. This creates additional legal problems for the Sales Barns and Fin-Ag under the Court's rationale.

[¶52.]     SDCL 12-11-12 provides:

> Any person who, having knowledge, which is not privileged, of the commission of a felony, conceals the felony, or does not immediately disclose the felony, including the name of the perpetrator, if known, and all of the other relevant known facts, to the proper authorities, is guilty of misprision of a felony. Misprision of a felony is a Class 1 misdemeanor. There is no misprision of misdemeanors or petty offenses.

[¶53.]     A criminal complaint in this case could allege a Class 6 felony, under SDCL 44-1-12[22] for the sale of mortgaged property. The Court's interpretation of

---

22.     SDCL 44-1-12 provides:

Any mortgagor or grantor of security interest or other lien or personal property who, while the lien of his mortgage, conditional sales agreement, or security agreement remains in force and unsatisfied, willfully destroy, conceals, *sells, or in any manner disposes of* or materially injures any part of

(continued . . . )

SDCL 57A-9-609.1 strongly indicates that one in Fin-Ag's position, together with those in the position of the Sale Barns,[23] should attempt to negotiate an arrangement that might avoid "law enforcement intervention."  *See supra* note 8.  No such safe harbor is found in the terms of SDCL 44-1-12.  The text of SDCL 44-1-12 makes it clear the crime is committed upon the unauthorized sale or disposition of the encumbered property.  With the crime complete, there is no legal effect upon its status by an after the fact notice.  That notice only affects the civil remedies contained in SDCL 57A-9-609.1.

[¶54.]      Our Legislature has not condoned the practice suggested by the Court's interpretation of SDCL 57A-9-609.1.  To the contrary, they have indicated their disfavor by enacting a chapter prohibiting obstruction of justice under which our misprision statute is found.  If a felony has been committed then a private

---

(. . . continued)

> the property covered by such mortgage, conditional sales agreement, or security agreement without the written consent of the holder of such mortgage, conditional sales agreement, or security agreement, or who willfully abandons the property covered by such mortgage, conditional sales agreement, or security agreement without first giving written notice to such secured party of his intention to abandon such property, or who removes any part of the property covered by such mortgage, conditional sales agreement, or security agreement from the county in which such mortgage, conditional sales agreement, or security agreement is filed except temporarily in accordance with the usual and customary use of the same or similar kinds of property while the lien of his mortgage, conditional sales agreement, or security agreement remains in force and unsatisfied without the written consent of the holder of such mortgage, conditional sales agreement, or security agreement is guilt of a Class 6 felony.

> (Emphasis added).

23.   *See* SDCL 57A-9-609.1, *supra* note 6, for the list of entities in addition to "livestock auction agenc[ies]" covered under the statute.

person has a legal obligation to report it. "The fundamental mission of a court in interpreting legislative acts is to ascertain and give effect to the intention of the Legislature." Breck v. Janklow, 2001 SD 28, ¶20, 623 NW2d 449, 457 (citing S.D. Subseq. Injury Fund v. Federated Mut., 2000 SD 11, ¶18, 605 NW2d 166, 170). Clearly, when the Legislature revised the entire criminal code in 2006, they did not modify SDCL 12-11-12 to exclude the duty to report a felony to law enforcement, which would have been necessary under the Court' interpretation of SDCL 57A-9-609.1.

[¶55.] The Court cites SDCL 22-30A-32,[24] 22-30A-42[25] and 22-30A-19.3[26] as supportive of its contention that a legislative intent for civil process to

_____

24. SDCL 22-30A-32 provides:

The holder of an insufficient funds check or no account check shall, before presenting the check to the state's attorney for prosecution, serve a notice of dishonor *upon the writer of the check*, by registered or certified mail, return receipt requested, or by first class mail, supported by an affidavit of mailing sworn and retained by the sender, in the United States mail and addressed to the recipient's most recent address known to the sender. If the notice is mailed, and not returned as undeliverable by the United States Postal Service, notice is conclusively presumed to have been given on the date of mailing. The holder of the dishonored check, whether it be a no account check or insufficient funds check, shall, upon return of the receipt, hold the check for a period of at least thirty days if notice is given by first class mail, and upon the expiration of that period shall present the check with the attached bank return, return receipt or affidavit of mailing, and copy of the dishonor notice to the state's attorney for prosecution. (Emphasis added).

25. SDCL 22-30A-42 provides:

A motor fuel retailer may, within thirty days of the occurrence, *demand payment from the motor vehicle owner for the motor fuel received by sending a notice by certified mail, return receipt requested*. (Emphasis added).

26. SDCL 22-30A-19.3 provides:

(continued . . . )

take precedent over a criminal process is nothing new. Closer examination of these statutes actually supports a result contrary to the Court's interpretation of SDCL 57A-9-609.1. This is because all three statutes specifically mandate that the initial notice be sent to the wrong-doer. SDCL 57A-9-609.1 does not.

[¶56.]        SDCL 22-30A-32 passed in 1973 and 22-30A-19.3 passed in 1989, predate the passage of SDCL 57A-9-609.1 in 2000. Since SDCL 22-30A-42 was passed in 2005, after the enactment of SDCL 57A-9-609.1, it is apparent that the Legislature has consistently maintained a policy of specificity when requiring notice be sent to the wrong-doer before a criminal compliant may be signed. "This [C]ourt assumes that statutes mean what they say and that legislators have said what they meant." Petition of Famous Brands, Inc., 347 NW2d 882, 885 (SD 1984) (citing Crescent Electric Supply Co. v. Nerison, 89 SD 203, 210, 232 NW2d 76, 80 (1975)).

[¶57.]        Moreover, the language mandating the act in SDCL 22-30A-32, 22-30A-19.3 and 22-30A-42 is completely different than the requirement of SDCL 57A-9-609.1. Under the three statutes cited by the Court, the person sending the notice is to send a "notice of dishonor" or a "demand for payment" to the one facing potential criminal prosecution. This is a far cry from the dictates of SDCL 57A-9-

---

(. . . continued)

> Any owner or seller of merchandise who is the victim of retail theft pursuant to SDCL 22-30A-19.1 may make a written demand for the amount for which any person is liable pursuant to SDCL 22-30A-19.1. . . . *The demand for payment shall be mailed by certified mail to the person from whom payment is demanded or served personally on the person from whom payment is demanded. Personal service shall be accomplished in the same manner as the service of a summons. (Emphasis added).*

609.1 which mandates the victim offer to file "against the debtor, a [criminal] complaint as defined by section 23A-2-1."

[¶58.]     Thus, it is clear the Legislature was fully aware of how to enact such a requirement of notice to a wrong-doer should it have chosen to do so.   However, the text of SDCL 57A-9-609.1 does not contain a requirement of notice to a wrong-doer. The only way the statute can have any effect is to offer to file a criminal complaint with a government agency authorized by law to do something with that complaint.

[¶59.]     The language of SDCL 57A-9-609.1 is clear.  Before filing a civil claim, a plaintiff is required to offer to file a criminal complaint with the Attorney General, a State's Attorney or law enforcement.  In other words, prior to commencing litigation and all that that entails, the State must first be given an opportunity to determine whether it has a criminal law enforcement interest in the matter.

[¶60.]     For the above reasons, I would reverse and remand with instructions to dismiss for failure to comply with SDCL 57A-9-609.1.

SABERS, Justice (dissenting on all Fin-Ag cases on the FSA issue).[27]

[¶61.]     Incredibly, Fin-Ag presents this Court with authority from a neighboring state that is virtually on point to the circumstances of this case; yet, the opinion goes out of its way at every opportunity in its analysis of the issues to arrive

---

27.    As the opinion acknowledges, this case is similar to Fin-Ag, Inc. v. Cimpl's, Inc., 2008 SD 47, __NW2d __, and Fin-Ag Inc. v. Watertown Livestock Auction, Inc., 2008 SD 49, NW2d __.  Because these cases are closely related and should be read together, it necessitates that I restate the underlying flaw in the FSA analysis stated in *Cimpl's*, 2008 SD 47, ¶¶10-47, __NW2d ___, and perpetuated here.

at the opposite conclusion of the *Hufnagle* case.  Because I cannot agree with the opinion's analysis and conclusions regarding FSA protection, I dissent.

[¶62.]        In *Hufnagle*, the lender, Fin-Ag had a perfected security interest in Buck's corn crops.  720 NW2d 579, 580 (Minn 2006).  Fin-Ag also filed an effective financing statement, "which caused the interest to be listed in Minnesota's central filing system." *Id*.  Meschke was a registered farm products dealer and he received the central filing system's list of sellers whose grain was encumbered by security interests. *Id*.  When Meschke bought corn directly from Buck he, with two exceptions, made the checks payable to Buck and Fin-Ag jointly. *Id*.

[¶63.]        Later, Meschke bought corn from persons, the Tookers, who claimed they were the sellers. *Id*. at 583-84.  There was no one by the name Tooker on the central filing system list. *Id*.  Meschke bought corn from the Tookers seven different times. *Id*.  The proceeds from these seven transactions were deposited in the debtor's (Buck's) account. *Id*.  Fin-Ag was not made a co-payee on any of these checks.

[¶64.]        Fin-Ag sued Meschke for conversion after Buck failed to repay Fin-Ag. The Minnesota district court granted summary judgment in favor of Fin-Ag.  On appeal, the Minnesota Court of Appeals affirmed. *Id*.

[¶65.]        The Minnesota Supreme Court held Meschke was liable for conversion. *Id*. at 581.  In doing so, it noted that it must determine "how section 1631 works in the situation of 'fronting' sales.  The parties describe 'fronting' as being where a seller of farm products that are subject to a security interest has a third party sell them under the third party's name." *Id*. at 584.  The court recognized that "both

Meschke and Fin-Ag can be viewed as innocent parties in the sense that they each did everything they were required or expected to do under the FSA." *Id.*

[¶66.] The buyer, Meschke, made arguments that are similar to the Sale Barns' arguments in this case. For instance, Meschke argued that it is difficult for a buyer of farm products to discover a security interest in a fronting situation and lenders are better suited to police these situations. Sale Barns advanced a virtually identical argument.

[¶67.] Despite this argument, and the recognition of the difficulty a fronting situation presents for a buyer, the Minnesota Supreme Court found it was "constrained to apply the plain language of the statutes, as enacted by Congress and the Minnesota Legislature, and to follow where they lead." *Id.* at 585. The court noted that the "created by the seller" language was a serious limitation on the FSA's protections afforded to the buyer. Moreover, the language has come under much criticism, but Congress "essentially incorporated this clause in section 1631 when it attempted to correct some of the other shortcomings, from the perspective of buyers, of UCC section 9-307." *Id.*

[¶68.] Due to this limitation, Meschke could not find protection, even in the fronting situation and even though he was an innocent buyer. The court noted:

> The inclusion of the "created by the seller" clause in section 1631 means that the statute does not provide protection for buyers in a fronting situation where the security interest from which protection is sought was not created by the fronting parties. *Under the facts of this case, no matter what factual assumptions we make, there are none under which Meschke could take the corn free of Fin Ag's security interest.* This is because **if we view Buck as the seller**, we must conclude that *Meschke's rights are subject to Fin Ag's security interest* under

> section 1631 because Fin Ag filed an "effective financing statement" that put Meschke on notice of Fin Ag's security interest in Buck's products. And, ***if we view the Tookers as the sellers***, we must conclude *that Meschke's rights are subject to Fin Ag's security interest*, under either section 1631 or Minnesota's UCC, *because both statutes only protect a buyer from a security interest created by the seller and not from a security interest created by an undisclosed owner*, which continues in the product despite the sale.

*Id.* at 586 (emphasis added). Here, the same result is required, if we view Calvin and Michael Berwald as the seller, then Sale Barns' rights are "subject to Fin-Ag's security interest under section 1631" because Fin-Ag filed an 'effective financing statement' that put [Sale Barns] on notice . . . ." *Id.* Alternatively, if we view C&M Dairy as the seller, then "we *must* conclude that [Sale Barns]' rights are subject to Fin-Ag's security interest" because under section 1631, a buyer is only protected "from a security interest created by the seller and not from a security interest created by an undisclosed owner." *See id.*

[¶69.] Instead, the opinion distinguishes *Hufnagle* by declaring "fronting" different than using a d.b.a.[28] It rationalizes that the *Hufnagle* court did not "consider the fourth factual scenario that is before this Court, i.e., debtors, who created the security interest, and conducted their business under their d.b.a. business name." *See* Fin-Ag v. Cimpl's, 2008 SD 47, ¶31, ___NW2d ___. However, when discussing if C&M Dairy can be a seller under the FSA, the opinion declares

---

28. The opinion attempts to distinguish the *Hufnagle* case by explaining a fronting situation only occurs when a separate third person sells the product. However, what about the deliveries where Austin, Arlen, a semi-driver or some other unidentified person delivered cattle to the sale barns? Are these

(continued . . . )

that C&M Dairy is an "other business entity," separate and distinct from the Berwalds. *Id.* ¶23 (quoting 7 USC § 1631(c)(10). The use of a separate and distinct entity to sell cattle subject to a different owner's security interest is factually analogous to *Hufnagle*, and *is* fronting. As the Minnesota Supreme Court noted, "[t]he corn [cattle] had been sold to Meschke [Sale Barns] in the names of third persons [separate entity, C&M Dairy] not involved with the debt to Fin-Ag." *Hufnagle*, 720 NW2d at 580. This issue should be decided based on the rationale expressed in *Hufnagle*.

[¶70.]     The opinion can call it anything it wants, but it cannot hide what is plain and obvious. In its attempts to decide this case in favor of the Sale Barns, it arrives at some conflicting conclusions. For example, the opinion concludes that C&M Dairy is a "business entity" and therefore separate from Calvin and Michael Berwald and can be a seller under the statute, thus the FSA protects Sale Barns. Then, in the next portion of analysis, C&M Dairy is merely a d.b.a. and cannot be separated from the Berwalds, therefore C&M Dairy created the security interest and again, Sale Barns win. In reality, C&M Dairy is an illegal fiction and definitely a fronting situation. It is not an entity or an alter ego – and certainly not both the "seller" and the "seller who created the security interest."

[¶71.]     There are two different interpretations of a supposed entity, yet the same strained outcome. When defining "seller," it is inconsistent to say that in one

_____

(. . . continued)
     not third persons? Or are we to consider anyone who delivers cattle for
     C[alvin] & M[ichael] Dairy a part of that fictitious entity?

instance C&M Dairy is an entity distinct from the Berwalds, so C&M Dairy can be the seller and claim Sale Barns did not receive notice of Fin-Ag's security interest, and then to say the Berwalds and C&M Dairy are "one and the same" in order to find C&M Dairy is the "seller who created the security interest." In *Hufnagle*, the Minnesota Supreme Court specifically refused to "define seller two different ways in the same analysis without a significant indication that this was the legislature's intent. No such indication [of legislative intent] exists here." 720 NW2d at 588-89. We should not interpret seller two different ways.

[¶72.] We certainly should not interpret seller two different ways when many commentators have criticized the limitation "created by the seller" in the context of 9-307, yet the clause has never been amended or eliminated since the UCC was rewritten in 1957. *Hufnagle*, 720 NW2d at 585 (citing William H. Lawrence, *The "Created by His Seller" Limitation of Section 9-309(1) of the UCC: A Provision in Need of an Articulated Policy*, 60 Ind. L.J. 73, 73-74 (1984-1985) and Richard H. Nowka, *Section 9-302(a) of Reviewed Article 9 and The Buyer in the Ordinary Course of Pre-Encumbered Goods: Something Old and Something New*, 38 Brandeis L.J. 9, 23-24 (1999-2000)). Significantly, despite its criticisms, Congress included this clause in section 1631 of the FSA in 1985 when attempting to correct some of the other problems of buying food products under the UCC. *See supra* ¶67 (Sabers, J., dissenting) (citing *Hufnagle*, 720 NW2d at 585).

[¶73.] White and Summers have discussed the difficulties with the "created by the seller" language. *See* 4 White & Summers, Uniform Commercial Code § 33-13 (4th ed 1995 & Supp 2007) (discussing the problems produced by the created by

the seller language in former UCC § 9-307).  Importantly, they theorize that:

"Perhaps the drafters intended that as between two innocent parties the ultimate loss should fall on the party who dealt most closely with the 'bad guy.'"  *Id.*  Although this may conflict with the FSA policy, we have to presume that Congress knew what it was doing when it borrowed this language from the UCC.

[¶74.]        In each of the cases here,[29] the Sale Barns knew they were dealing with Calvin or Michael Berwald, or both, before they were dealing with "C&M Dairy."  Calvin Berwald is the "C" and Michael Berwald is the "M" and the Sale Barns knew it, and they should suffer the ultimate loss.  The Sale Barns either took a "head in the sand" approach and let the Berwalds tell them who they were acting as, or they simply decided that even though Berwald and family were listed in the master list, if the Berwalds chose to call themselves something else not mentioned on the list, the Sale Barns took the position they had to go strictly with the list.[30]

---

29.    Cimpl's may not have known C&M Dairy as Michael and Calvin Berwald specifically; however the deliveries were made by Austin, Calvin, Michael, or Arlen Berwald.  The other sale barns had received deliveries of cattle from Michael and Calvin Berwald in the past as well.

30.    Either way, when compared to *Hufnagle*, these facts make it a much stronger case for Fin-Ag to prevail because in *Hufnagle*, the buyer was not dealing with the owner/debtor, Buck, but was dealing with completely unrelated sellers, the Tookers.  Here, Sale Barns dealt solely with the Berwalds simply using an unregistered, fictitious name.  The Sale Barns knew they were dealing with the Berwalds fronting as C&M Dairy.  Once again, it is not rocket science that the "C" in  C&M Dairy stands for Calvin Berwald, and the "M" in C&M Dairy stands for Michael Berwald, especially when they or their father, Arlen Berwald, delivered the cattle.

In the Watertown Livestock case (2008 SD 49, __NW2d __), the decision to go with C&M Dairy as the seller was self-serving, as it allowed the sale barn to collect on a past debt. *See* Fin-Ag v. Watertown Livestock, Brief of Appellee at 4, 2008 SD 49, __ NW2d __ (No. 24050). In sum, these Sale Barns were more closely dealing with the "bad guy."[31]

[¶75.]    It does not end there. Again, in an attempt to distinguish *Hufnagle*, the opinion indicates that *Hufnagle* "appeared to involve collusion on the part of the buyer." *Cimpl's*, 2008 SD 47, ¶33, __NW2d __. Never mind the fact that the Supreme Court of Minnesota did not rely on that specific fact in its analysis and it is not relevant to the discussion. It merely seeks to cloud the real issues. Indeed, the court noted that "no matter what factual assumptions we make, there are none under which Meschke could take the corn free of Fin Ag's security interest." *Id.* at 586.

---

31.   Under South Dakota Law, it is not only a crime to sell mortgaged property without the mortgagee's consent, *see* SDCL 44-1-12, it is also a crime under SDCL 37-11-1, for any person to engage in or conduct a business for profit in South Dakota "under any name which does not plainly show the *true surname* of each person interested in such business unless a statement is filed first." (Emphasis added). Furthermore, South Dakota has had a fictitious name certificate statute for at least sixty-nine years. The fictitious name certificate must be filed in the register of deeds office or secretary of state's office. Penalties are provided for failure to file and it constitutes a misdemeanor.

Although these issues were not raised in the briefs, the Sale Barns are "presumed to know the law" and should not benefit from two separate violations of the criminal law.

[¶76.]        The opinion's analysis of this issue in *Cimpl's*, 2008 SD 47, ¶¶10-47, __NW2d __, incorporated by reference here, *see supra* ¶21, sends the message to deceitful debtors that they can avoid the security interest if they use their initials as a fictitious name to sell their collateral to sale barns.  That opinion blindly accepts the answer of the driver of the cattle truck to the yardman that the seller is "C&M Dairy," even if the driver of the truck is Calvin Berwald, Michael Berwald or their Father, Arlen Berwald.  Interpreting the statutes in this manner produces the exact result we should prohibit – absurd.  That opinion claims the burden should be on the lender, the party who is more capable of policing this problem.  However, it seems it would be next to impossible for a lender to prevent its debtor from creating a fictitious name, with no fictitious name filing, and selling cattle under that name, while it would be relatively easy for the Sale Barn to dig past the fictitious name and inquire as to the proper owner and seller of the cattle.

[¶77.]        Finally, the opinion in *Cimpl's*, 2008 SD 47, __NW2d ___, thoroughly discusses the background of the enactment of the FSA.  It details the overarching theme of protecting buyers from the threat of double payment.  Then, that opinion finds the statute ambiguous, because seller is not defined, and declares that we must use the policy behind the act to interpret the statute.  *See Cimpl's*, 2008 SD 47, ¶20, __NW2d __.  Thus, according to that opinion, we must interpret the statute to favor the Sale Barns.

[¶78.]        However, failure to define a term does not automatically result in an ambiguity.  Jackson v. Canyon Place Homeowner's Ass'n, 2007 SD 37, ¶11, 731 NW2d 210, 213 (citing Halls v. White, 2006 SD 47, ¶8, 715 NW2d 577, 581).

Moreover, we consistently only use the plain language of the statute and never examine the policy or legislative history unless the text is ambiguous. "Resorting to legislative history is justified only when legislation is ambiguous, or its literal meaning is absurd or unreasonable. Absent these circumstances, we must give legislation its plain meaning. We cannot amend [the statute] to produce or avoid a particular result." *In re* Estate of Howe, 2004 SD 118, ¶41, 689 NW2d 22, 32 (quoting Slama v. Landmann Jungman Hosp., 2002 SD 151, ¶7, 654 NW2d 826, 828 (quoting Petition of Famous Brands, Inc., 347 NW2d 882, 885 (SD 1984))); *see also In re* Estate of Olson, 2008 SD 4, ¶38, 744 NW2d 555, 566; Jensen v. Turner County Bd of Adjustment, 2007 SD 28, ¶5, 730 NW2d 411, 413; Goetz v. State, 2001 SD 138, ¶16, 636 NW2d 675, 681; Reider v. Schmidt, 2000 SD 118, ¶9, 616 NW2d 476, 479. As Judge Timm noted, "[t]he FSA is not ambiguous, and the seller using a different name does not create an ambiguity in the language of the statute." We should interpret seller consistently. If interpreted consistently and using the plain language of the statute, the Sale Barns are not protected by the FSA. It takes an owner or someone with interest in the property to create a security interest. If Congress meant a fiction or a front instead of the word seller, it would have said so.

[¶79.]		There is a scarcity of authority on this issue. We should refuse to engage in statutory interpretation that so heavily favors the Sale Barns to a lender's disadvantage without a clear directive from Congress to do so. The rationale and holding set forth in *Hufnagle* should be the law of South Dakota.

#23982, #24001, #23984

In summary:

<u>Pipestone (#23982, #24001)</u> --

1.  I agree with Judge Kean (Retired) and the opinion that Fin Ag's offer complied with SDCL 57A-9-609.1.

2.  I would reverse Judge Kean (Retired) on the FSA seller issue for the reasons stated in my writing.

3.  I agree that the FSA did not protect Pipestone because Pipestone was acting as a lender (creditor) when it applied the sale proceeds to C & M Dairy's account at Pipestone for prior purchases.

4.  Conversion – Because summary judgment was granted on the conversion issue and because there are many genuine issues of material fact (as discussed in Justice Zinter's writing), I agree we should reverse and remand this issue.

5.  Damages—Genuine issues of material fact also exist on the damage questions raised in Justice Zinter's writing in paragraphs 41-43 *supra* and I agree we should reverse and remand for trial.

<u>South Dakota Livestock of Watertown (#23984)</u> –

1.  I agree with Judge Timm and the opinion that Fin-Ag's offer substantially complied with SDCL 57A-9-609.1.

2.  I would affirm Judge Timm on the FSA seller issue for the reasons stated in my writing.

3.  However, because Judge Timm granted summary judgment on the conversion issue and because there are many genuine issues of material fact (as

-45-

discussed in Justice Zinter's writing), we must reverse and remand this issue. Moreover, I would reverse and remand the issue whether the EFS description was adequate or seriously misleading as it involves disputed issues of material fact regarding the type of cattle sold and the description of the debtor.

4. Genuine issues of material fact also exist on the damage questions raised in Justice Zinter's writing in paragraphs 41-43 *supra* and I agree we must reverse and remand for trial.

5. Genuine issues of material fact also exist on the issue whether Fin Ag's security interest was waived or extinguished.

[¶80.] KONENKAMP, Justice, joins this dissent.